[Civ. No. 15557. First Dist., Div. One. July 1, 1953.]

Estate of SARAH AGUSTA BEEBEE, Deceased. BERTHA A. RICHARDSON et al., Appellants, v. RALPH A. BEEBEE, JR. et al., Respondents.

Marvin C. Hix for Appellants.

Harry N. Grover, John F. O'Sullivan and Wienmann, Rode, Burnhill & Moffitt for Respondents.

BRAY, J.—Appellants appeal° from an order revoking the probate of a certain will and codicil and admitting to probate as the last will of decedent a certain writing in letter form.*

## QUESTION

Basically, does the evidence support the finding that this letter was intended by decedent to be her will?

## RECORD

Sarah Agusta Beebee died June 16, 1950. Thereafter a document dated April 26, 1944, and one dated July 8, 1947 (the latter holographic in character) were admitted to probate as the last will and testament and codicil of said decedent. Subsequently, a petition for revocation of probate of said will and codicil and probate of the letter in question was filed by Robert A. Beebee. Ralph A. Beebee, Jr., petitioned separately for the revocation of probate of the will and codicil. Appellants filed objections to both petitions. The court found that the letter was intended to be and was the last will of decedent, admitted it to probate, and revoked the probate of the prior will and codicil.

---

*Hereafter for convenience referred to as "letter."

EVIDENCE

There is no conflict in the testimony, the claimed conflict being in the inferences to be drawn therefrom and in the construction of the letter. Decedent was a woman 89 years of age, growing blind, and while in good health, was not strong. She had one son, Ralph A. Beebee, who predeceased her by two days, and two grandsons, Ralph A. Beebee, Jr., the child of Ralph Sr. and his first wife, and Robert A. Beebee, a minor, the son of Ralph Sr. and his second wife, who after her divorce remarried and is Mrs. Irene Meniktos. Ralph Jr. disappeared around 1930, was never afterwards heard of by decedent, and was disinherited. Decedent had deposited with the Wells Fargo Bank and Union Trust Company, the executor and trustee under the will and codicil originally admitted to probate, a will made in 1940. On April 26, 1944, Mr. Falconer, one of the attorneys for the bank, drew a will for decedent which she executed. This will left a piano to her grandson Robert, and the rest of her furniture to her son Ralph Sr. The rest of her estate was to be converted into cash, an endowment policy for $500 on Robert's life to be purchased, and the balance used to procure a life annuity for Ralph Sr. In the event of his death, prior to the purchase of the annuity, the estate was to go to Bertha Richardson, Ralph Sr.'s wife by his first marriage, Evelyn Jacobs, a protégée, Elizabeth B. Snell, Lillian James Larson and Josephine Woolf, intimate friends. This will was deposited with the bank. From time to time the trust department sent out notices to decedent, as well as others, to look over their present wills to see if they desired to make changes. On July 3, 1947, decedent drew a codicil dated that day, which read, "I, Sarah A. Beebee, bequeath to my grandson, Ralph Augustus Beebee, $10.00." It was signed by her. This she sent Mr. Falconer in a letter in which she asked if it could be legally attached to her will, and if not what she could do to make it legal. July 7th Mr. Falconer wrote her to the effect that the proposed codicil was legal but suggested that in view of the reasons she had given in her letter for limiting her grandson Ralph Jr. to only $10, she sign a codicil which contained a "non-contest clause," form of which he enclosed. He suggested that if she could not come to his office she copy the form in her own handwriting. This she did, dated it July 8th, and sent it to be, and it was, deposited with the bank. According to Mrs. Snell, a close friend of decedent, when decedent had anything to write that was important,

she would first write a draft of it, then rewrite it, sometimes making minor changes. She would keep the first draft as a copy. She also told Mrs. Snell many times, even as late as within two weeks of her death, that she would be afraid to make a will without an attorney's advice. Prior to 1950 Ralph Sr., having been divorced from his second wife, returned to live with decedent in the home which she owned. In March, 1950, Ralph Sr. was engaged in the contracting business and needed money. Decedent had given him all she could to help him, and through him, had put her property up for sale so as to get more money for him. The sale did not go through. About March 14th, Mr. Scott received the following letter (exhibit 1):

"#1318—43rd Ave San Francisco Mar 11th 1950

Wells Fargo Bank and Union Trust Company
Market at Montgomery St, San Francisco
Mr. Robert T. Scott
Manager Estate Planning Division

Dear Mr. Scott:
"Conditions have changed making it desirable that I revoke all former wills and codicils made by me, and wish to leave my entire estate to my son, Ralph Agustus Beebee without reservations. I am 89 years old, Helpless and growing blind. Please help me either to add a new codicil or to make a new will

Sarah Agusta Beebee
dated Mar 11th 1950"

On that day Scott phoned decedent. She stated that she wanted someone from the bank to come out as it was difficult for her to get downtown because of her condition. Scott told her the bank could not help her, that what she needed was an attorney, that the bank's records showed Mr. Falconer to be her attorney, and suggested she either phone him or some other attorney, or, if she desired, Scott would send the letter to Falconer and have him phone her. At her request he phoned Falconer. Scott said Falconer called her. Falconer testified that he is not sure whether or not he had any telephone conversation with decedent. He has no recollection of one. She did not come to his office.

She died approximately three months after the date of exhibit 1 (the letter above quoted). On the day of her death, one of the bank's employees found among other papers at her

home petitioner's exhibit 2, which he delivered to the bank. This reads:

"#1318—43rd Ave

San Francisco, California March 1⅜th
1950
Wells Fargo Bank & Union Trust Co.
Market at Montgomery St, San Francisco
Mr. Robert T. Scott
Manager Estate Planning Division

Dear Mr. Scott

"I wish to revoke all former wills & codicils to wills made by me as conditions no longer no longer exist, as at that time I wish to leave my entire Estate to my Son Ralph Agustus Beebee without reservation.

Sarah Agusta Beebee

"I am eighty nine years old and growing blind, and not able to get down town to the bank. So please do what is necessary under the circumstances, whether by codicile or a new will.

Sincerely

Sarah A Beebee"

It is conceded that the date as originally written was "13th." Decedent then wrote over the figure 3 either a line or the figure 1. This is the document the court has now admitted to probate.

### Is Exhibit 2 a Will?

Respondents contend that the correct date of Exhibit 2 is March 18th. They further contend that after decedent heard from Scott in reply to her letter of March 11th, and also from Falconer, decedent wrote exhibit 2, first mistaking the date for March 13th and then by drawing a line through it, changing the date to the 18th; that in writing the document she intended the part above her first signature to be her will. The court so found both as to date and intent.

Appellants contend that the correct date of exhibit 2 is March 11th, that it is the first draft of exhibit 1, and that there is no evidence that decedent ever intended exhibit 2 to be a will.

It might be well to determine the scope of our review in a case of this kind. ■ If there is a conflict in the evidence bearing on the question of decedent's intent as to exhibit 2, or in the reasonable inferences to be drawn therefrom, we are bound by the trial court's determination of that

conflict. But if there is no evidence on the subject, and the determination of whether exhibit 2 constitutes a will is to be made solely from that instrument, or if there is no conflict in the evidence and the inferences therefrom, we are not bound by the trial court's interpretation and can make our own interpretation. (*Estate of Platt,* 21 Cal.2d 343 [131 P.2d 825].)

"While it is true that courts will not make a will for a decedent who has failed to do so for himself, it is also true that the law favors testacy rather than intestacy, and will give such construction to instruments bearing the character of wills as is necessary to carry out testamentary intent. They will also examine facts and circumstances surrounding its execution, to the end that the intent of the maker of the paper may be discovered." (*Estate of Spitzer,* 196 Cal. 301, 305-306 [237 P. 739].)

If exhibit 2 is dated the 11th there is no evidence or reasonable inference therefrom that decedent intended it as a will. She had drawn two formal wills and one codicil. (This codicil was complete in itself and was not in the form of a letter.) She was in the habit of writing out a rough draft of any important paper and then rewriting and correcting it, and keeping the original as a copy. She stated that she would not attempt to make a will without a lawyer's advice. Her letter sent with the codicil and the substance of exhibits 1 and 2 confirm this. She kept her testamentary papers at the bank. Exhibit 1 is a condensation of exhibit 2. Although she was becoming blind, her careful habit in writing a finished product makes it doubtful that she would leave as a final form a document containing the repetitious "no longer no longer." The form of the writing itself is that of a letter. It is addressed to the bank and concludes "Sincerely."

But, say respondents, the fact that it bears the date of the 18th is shown in two ways (1) by the fact that she must have been advised by Attorney Falconer about that time, and (2) by an examination of the figure itself. As to the first contention, there is nothing in the evidence to support the assumption that Falconer would have advised her to write another letter to Scott or to draw her will in letter form. Nor is there anything in the evidence to explain the fact that if she wanted this to be her will, she would not have mailed it to the bank to whom it was directed. Its very form is almost conclusive proof that she was not acting after an

attorney's advice. There is no explanation as to why, assuming she was acting on the 18th, and assuming that after talking to Falconer she felt advised to make the will in letter form, she would desire to repeat what she had said in her previous letter, that she was 89 years old and then again ask the bank to do what was necessary either by codicil or new will. Under the respondents' theory she had already been told by Falconer what was necessary to be done.

This brings us to a consideration of the determination of the date from an examination of the figure itself. This under the doctrine of *Estate of Platt, supra,* 21 Cal.2d 343, we are entitled to do by an examination of the instrument itself. (See, also, 4 Cal.Jur.2d 484.) The line which is drawn through the 3 in 13th is a straight one, and is much heavier than in any figure or other portion of her handwriting. It appears that the line may have been gone over a second time. Moreover, it is much wider at the top than at the bottom and runs beyond the lower portion of the 3. In examining the 3 and the 8 made by her in the address "1318" it does not appear probable that to change a 3 into an 8 decedent would have attempted it by a straight line. We conclude that the correct date is the 11th.

Again, assuming that it was written on the 18th there is still no evidence to support the theory that she left it with her papers intending it to take effect as a will. Reading it as a whole it is evident that she expected something more to be done before it would become a will. ". . . before a document will be admitted to probate as the last will and testament of a decedent, it must satisfactorily appear that the maker of the instrument intended *by the very paper itself* to make a disposition of his property . . ." (*Estate of Kisling,* 68 Cal.App.2d 163 [156 P.2d 57].)

Actually, the determination that decedent left exhibit 2 intending it to operate as a will is based entirely upon the surmise of what Attorney Falconer may have said to her. Such surmise, too, is based on the assumption that he advised contrary to his previous advice and contrary to the advice which an attorney would ordinarily give. Mere speculation cannot be allowed to do duty for probative facts. (*Gray* v. *Southern Pac. Co.,* 23 Cal.2d 632, 645 [145 P.2d 561].)

Construing the instrument alone it shows it was not intended to be testamentary. While if the portion above the first signature were all there was to the document, it could

be considered as testamentary in spite of the fact that it is in letter form,* the balance of the document shows that at most it is a letter to the bank telling them how she wished to change her will but intending that the preparation of a codicil or new will was necessary before such intent could be effected. To construe exhibit 2 as a will, the entire latter portion of it must be completely disregarded. ■ ". . . the instrument should be read and considered in its entirety in passing upon its validity." (*Estate of Bower,* 11 Cal.2d 180 [78 P.2d 1012].) ■ Applicable here is the rule set forth in *Estate of Tarrant,* 38 Cal.2d 42, 51 [237 P.2d 505, 28 A.L.R.2d 419]: "While it is true that 'the findings of the trial court will not be disturbed on appeal if the record discloses substantial evidence to support them,' . . . such rule has no pertinency where the evidence without conflict clearly establishes the impropriety of the inferences drawn by the court from the uncontroverted facts."

In *Estate of Spencer, supra,* 87 Cal.App.2d 591, appears a well-reasoned analysis of a number of California cases, in some of which letters or portions of them claimed to constitute wills, were held to be testamentary in character, while in others they were held not to be such. The court quoted from *Estate of Wunderle,* 30 Cal.2d 274, 280, 281 [181 P.2d 874]: ". . . it must satisfactorily appear from the document offered . . . that the decedent intended by the very paper itself, to make a disposition of his property . . ."

■ In *White* v. *Deering,* 38 Cal.App. 433, 436 [177 P. 516], *Estate of Logan,* 29 Cal.App.2d 60, 64 [84 P.2d 245], and *Estate of Spencer, supra,* 87 Cal.App.2d 591, 598, there was applied the rule that where there exists a previously made and unrevoked will of the testator, the later holographic instrument claimed to be a will should be so phrased that there can be no doubt from its language that the intention of the testator was thus to make further testamentary provisions. Applying that rule in our case, the evidence instead of removing doubt that such was the decedent's intention makes conclusive the doubt which arises from the form of the instrument.

In *Estate of Grobe,* 96 Cal.App.2d 70 [214 P.2d 535], a letter from the decedent to his attorney starting "I wish to annul the Will . . . I wish to have you draw up another

*See *Estate of Pagel,* 52 Cal.App.2d 38 [125 P.2d 853], and see cases discussed in *Estate of Spencer,* 87 Cal.App.2d 591 [197 P.2d 351].

Will'' making his niece beneficiary, was held not to constitute a will. In *Estate of Moore*, 102 Cal.App.2d 672 [228 P.2d 66], the trial court was reversed in holding that the following writing found in the pocket of a coat of decedent hanging in a closet, " 'July 4, 1948 Mother Here is my ring. I leave you this and all that is mine. Mike is provided for. Dont grieve for me. I love you. I'll leave a Will. (Signed) MARY ELLEN' '' was not a will because "it shows that some other writing yet to be made would be her will'' (p. 675.) This is true of exhibit 2 in our case. The following language from the Moore case answers one of the arguments made here (p. 674): "Respondent argues that the intent clearly expressed in the undated document found near the body of decedent 'fortifies and corroborates' the intent expressed in the document offered for probate. It does fortify and corroborate the manner in which the decedent desired to leave her property but does not show that she intended to have that very paper itself operate as a Will.''

 "If a testator does not intend the instrument in question to take effect as his will, but intends it to take effect only when additional formalities are completed, it will not be given effect. For this reason, instructions for a will to be drawn and executed in the future will not amount to a will, although they would be a valid will as far as execution is concerned if testator had so intended.'' (1 Page on Wills, 3d ed., p. 131.)

In *Estate of Sargavak*, 35 Cal.2d 93 [216 P.2d 850, 21 A.L.R.2d 307], appear a number of cases in which documents appearing on their faces to be testamentary in character were held not to be such for the reason that the evidence showed that they were not so intended by the maker. The court said (p. 96): "It bears emphasis that we are here concerned not with the meaning of the instrument, but with the intention with which it was executed.''

*Estate of Salmonski*, 38 Cal.2d 199 [238 P.2d 966], cited by respondents, is not in point. There no appeal was taken from the court's order finding that the letter in question was testamentary in character and admitting it as a codicil to a former will. The only question before the court was the interpretation of its provisions reading it together with the will. It held that the words "last wish'' were mandatory in the codicil. In our case, were exhibit 2 as a whole testamentary in character the words "wish'' as there used would be considered mandatory. See, also, *Estate of Wood,* 36 Cal.

75. *Estate of Smilie,* 99 Cal.App.2d 794 [222 P.2d 692], differs from our case in that there the letter which the court held to be testamentary contains no statement or even intimation that it is to be followed by some further action, while exhibit 2 here shows on its face that it was not considered final by decedent. In both *Hewes* v. *Hewes,* 110 Miss. 826 [71 So. 4], and *Wells* v. *Lewis,* 190 Ky. 626 [228 S.W. 3], cited by respondents, the facts and the letters are completely dissimilar to the facts and letter in our case.

 The burden was on respondents as proponents of the alleged will to prove that decedent intended exhibit 2 to be her will. (*Estate of Relph,* 192 Cal. 451, 458 [221 P. 361].) Such fact must clearly appear. (*Estate of Spencer, supra,* 87 Cal.App.2d 591, 594.) It does not so appear and there is no substantial evidence to support the court's findings that it did.

In view of our decision it is unnecessary to consider appellants' contention that the court failed to find on all issues.

The order is reversed.

Peters, P. J., concurred.

WOOD (Fred B.), J.—I am unable to concur.

It appears to me that the finding of testacy is supported by substantial evidence, including the inferences which reasonably may be drawn from that evidence.

The instrument in question was entirely written, dated, and subscribed by the hand of the decedent. It was found among her papers. Its wording is indicative of a testamentary intent. The disposition it makes comports with the disposition she intended as narrated in her letter of March 11th to Mr. Scott. What more do we need?

Some confusion has arisen, stemming in part, it would seem, from the manner in which decedent indicated the date of this instrument.\* Apparently she dated it March "13th" and then drew a diagonal line through the "3" with the intention of converting it into a "1" or an "8." The trial judge says "8." I am not prepared to differ with him. The diagonal stroke through the "3" does not make an artistically finished and polished "8," yet it looks like a fair attempt,

---

\*The date which a testator writes into an olographic will need not be the very day upon which he penned the will. That question becomes significant, however, when other circumstances make it important to ascertain when, or about when, he did put pen to paper.

made by an elderly, feeble, nearly blind person. Also, this view of the altered date line receives support from other circumstances in the case.

Mr. Scott, to whom she wrote under date of March 11th, says he received her letter March 14th and that day phoned her that the bank could not perform the legal service of drafting a will or codicil for her; that she should get a lawyer; if she desired, he would turn her letter over to a lawyer; she so desired; accordingly, he did turn it over to a lawyer, Mr. Falconer, who had in 1947 advised her concerning the writing of an olographic codicil; and Mr. Falconer phoned her. Mr. Falconer has no independent recollection of having phoned but Mr. Scott has a definite recollection in that regard. Also, the questioned document contains some internal evidence of the reception of legal advice by the author of it. Her legal adviser, with her letter of March 11th in front of him, could readily have used it as a convenient vehicle when instructing her, transposing the words "Conditions have changed"; omitting the words "making it desirable that I revoke," substituting therefor the words "I wish to revoke"; and omitting the sentences "I am 89 years old, Helpless and growing blind. Please help me either to add a new codicil or to make a new will."

The addendum which she then or later wrote at the bottom of the same sheet of paper certainly was no revocation of the will (if it was a will) written on the upper portion. Nor did the addendum necessarily convert that will (if it was a will) into a mere request to draft for her a new will or a codicil to an old will. The words "please do what is necessary under the circumstances, whether by codicile or a new will," reasonably may be interpreted in their context, as a request to Mr. Scott to do the indicated drafting if he felt the will she had just written was not legally sufficient in every respect. Concerning the significance of the repetitious statement "no longer no longer," who in writing a brief or opinion has not committed similar inadvertent errors, errors which upon occasion have persisted through several editings, to be discovered only upon reading page proof, sometimes not until after the filing of the document?

Also, the trial judge well may have attached some significance to the fact that Mr. Scott did not hear from the decedent after their conversation on the 14th of March. If she felt secure in having written a will, she would not necessarily have an urge to communicate further. The question

has been asked: Why did she not mail this letter which contained this purported will? Need we speculate? She readily could change her mind about seeking further advice.

As it happened, her son and intended sole beneficiary died on the following 14th of June. She died two days later. Her grandson Robert, with whom she was on friendly terms, testified that following his father's death his grandmother told him, as he sat there at her bedside, she was going to make a new will and leave everything to him, save for bequests to his older brother Ralph, who was absent in Korea. That statement was quite consistent with her having made a will since March 11th, a will which left everything to her son, now deceased.

The evidence which conflicts with this evidence and these inferences was either rejected or given little weight by the trial judge, who saw and heard the witnesses. Decedent's expressed reluctance to make a will without an attorney's advice is of no significance if Mr. Falconer phoned and advised her. The trial judge had good ground for concluding that he did. The habit of writing a first draft of a letter, then revising it and mailing the revision, keeping the first draft as a copy, need not prevail over significant evidence of what the deceased probably did upon this particular occasion. We are not always and upon all occasions mere creatures of habit, even at 89.

Finally, my examination of the record convinces me that the trial judge decided all the issues presented to him in this proceeding.

I would affirm the order.

A petition for a rehearing was denied July 31, 1953. Wood (Fred B.), J., was of the opinion that the petition should be granted.

Respondents' petition for a hearing by the Supreme Court was denied August 27, 1953. Carter, J., was of the opinion that the petition should be granted.